UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEE CHARLES BRADFORD,

              Petitioner,

v.                                      Case Number: 2:05-cv-72889
                                      Honorable Marianne O. Battani

KENNETH ROMANOWSKI,

              Respondent.

_____/

## OPINION AND ORDER
## DENYING PETITION FOR WRIT OF HABEAS CORPUS
## AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

## I.    INTRODUCTION

      This is a habeas case filed by a Michigan state prisoner under 28 U.S.C. § 2254.

Petitioner Lee Charles Bradford is incarcerated by the Michigan Department of

Corrections, currently at the Alger Correctional Facility in Munising, Michigan.  On July

22, 2005, he filed this Habeas Petition, challenging his 2000 jury convictions for one

count of armed robbery, one count of felon in possession of a firearm, and one count of

felony firearm, which occurred in Hillsdale County Circuit Court.  On July 2, 2001,

Petitioner was sentenced, as an habitual offender, to concurrent prison terms of thirty-

seven to sixty years for the armed-robbery conviction, six years, four months to twenty

years for the felon-in-possession conviction, to be served consecutively to Michigan's

mandatory two-year prison term for the felony-firearm conviction.

      In his Habeas Petition, Petitioner raises claims concerning a *Brady v. Maryland*[1]

violation, prosecutorial misconduct, and the effectiveness of trial and appellate counsel.

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

Respondent filed an Answer to the Petition, alleging that it should be denied because Petitioner's claims are procedurally defaulted.

For the reasons stated below, the Court will deny the Petition.  The Court also will decline to issue Petitioner a Certificate of Appealability.

## II.     BACKGROUND

This case arises because of a bank robbery that occurred at the North Adams Branch of the Southern Michigan Bank and Trust in Adams Township in Hillsdale County, Michigan on December 1, 2000, where $15,100 was stolen.  A gunman, wearing a ski mask, entered the bank alone, waved a gun around, and ordered the tellers not to hit their alarm buttons and to get down on the floor.  Afterward, as the gunman was leaving the bank, he said, "Have a nice day."  The robbery lasted less than one minute.  As the tellers got up off the floor, two of them noticed an all-terrain vehicle (ATV) driving away from the scene.  They could not identify the gunman.

The prosecution's theory was that Petitioner was in financial difficulty and, after stealing an ATV, armed himself with a pistol and robbed the bank.  After robbing the bank, Petitioner tossed away a pair of sunglasses and a black knitted cap, worn during the robbery, on a side road while making his escape.  Marked money taken from the bank was found hidden in Petitioner's store in Jackson, Michigan, and proved involvement.

The defense conceded that a robbery occurred and the robber's use of a knitted cap or ski mask.  However, the defense argued that other people, including the prosecution's witness Harry Briskey, had access to Petitioner's store as well as to the ATV and that Petitioner had nothing to do with the robbery.

2

The Michigan Court of Appeals summarized the underlying facts of this case, when addressing Petitioner's insufficient evidence claim, which are presumed correct on habeas review. *See Monroe v. Smith*, 197 F.Supp.2d 753, 758 (E.D. Mich. 2001), *aff'd*, 41 F.App'x 730 (6th Cir. 2002) (citations omitted).

Regarding his claim that there was insufficient evidence to support his convictions, defendant does not contest that an armed robbery took place or that a firearm was utilized during the commission of such. Rather, defendant's arguments center on the lack of a connection between defendant and the charged crimes.

We find that there was sufficient evidence to connect defendant to the offenses in this case. Trial testimony demonstrated that [Bank Teller Rhonda Sue] Baker noticed a four-wheeler drive past the bank, and approximately five minutes later, the robber entered the bank. The robber was described as a man wearing a black knit ski mask, gold wire or dark sunglasses, a camouflage hooded sweatshirt, and black knit gloves. Baker testified that $15,100 was taken from the bank on December 1, 2000, including three twenty dollar bills, which were used as bait money. As the robber was leaving, he told the tellers to have a nice or good day. After the robber left, Baker saw the four-wheeler drive past the bank again, and [Shelly] Reed [, another bank teller,] indicated that the four-wheeler drove off to the east.

At approximately 9:30 a.m. on the same day, David Stoll [, a local farmer,] was driving his combine to his field when he saw a red, mid-sized car drive past him at a fast rate of speed, almost driving into the ditch in an effort to pass the combine. David noticed no objects in the road while he was driving. Approximately thirty minutes later, David's brother, Levi Stoll, drove to the combine location and discovered a black ski mask lying on the shoulder bank of the road. Birden Boone [Petitioner's friend] testified that as he and defendant were driving in a red Grand Am, he saw defendant throw a black hat out of the car window while they drove past a combine.

Harry Briskey [an inmate at the Michigan Department of Corrections] testified that he and defendant went to steal a motorcycle the night before the robbery, but that they actually stole a four-wheeler. Boone heard defendant and Briskey talk about getting the four-wheeler. Briskey indicated that defendant wore a dark blue or black ski mask when they stole the four-wheeler. There was also evidence that defendant removed some plywood from the front of the four-wheeler after stealing it

3

and upon his return to his house.  [Detective William] Kanouse located a piece of plywood with gun racks from the rear of a red barn on defendant's property.  The owner of the four-wheeler, Charles Boothe, testified that he had a platform and a gun rack installed on the front of the four-wheeler for hunting purposes.  Finally, the stolen four-wheeler was located in Teddy Yates'[s] sister's garage, after which the police discovered that Yates obtained the stolen four-wheeler from defendant.

There was also evidence that defendant informed Briskey that he would have to either declare bankruptcy or rob a bank, and that defendant showed Briskey the route he would take to rob the bank.  On the day of the robbery, Boone saw defendant placing money in a bag, and heard defendant state that he "did it," which led Boone to believe that defendant robbed the bank.  Defendant also informed Boone of specific details of the robbery, such as the fact that certain drawers were locked and that defendant told the bank tellers to have a nice day.  Defendant also informed Boone that he dropped some of the money in the wall of defendant's convenience store, which was later retrieved by Kanouse.  Also found in defendant's store were the three twenty dollar bills in bait money along with several wrappers from the North Adams branch of the Southern Michigan Bank and Trust that were marked with a stamp similar to that of money wrappers typically contained within Baker's drawer.

*People v. Bradford*, No. 242339, 2003 WL 22495579, at *6-7 (Mich.Ct.App. Nov. 4, 2003) (footnote and citation omitted).

Additional trial testimony revealed the following.

Richard Reiger testified that, in October 200, he sold property to Petitioner and his wife by land contract for $170,000.  Reiger testified that he received $5000.00 as a down payment over a three–month period.  By November 30, 2000, Petitioner owed $2,250.  Reiger said Petitioner made last-minute payments.  Petitioner told him that his financial situation was poor.  On December 1, at about 8:00 p.m., Reiger received a $2,250 cashiers check from Petitioner.

4

Charles Boothe was the owner of an ATV.  He testified that, in December 2000, he reported to the police that the ATV was missing.  The police found it in February 2001.

Teddy Yates, Petitioner's friend, testified that Petitioner called him on December 1, 2000, and told him that he had a house payment due that day and that his money was tied up.  He offered to do work for Yates in exchange for an advance of $2350, and offered an ATV as collateral.  Yates took a check to Petitioner but he did not receive an ATV as collateral.  Rather, Petitioner took the check.  Yates got the ATV several weeks later in December 2000.  Yates did not know that the ATV was stolen.

Petitioner testified.  He said he had a party store that he ran with Boone.  He said his financial situation leading up to December 1, 2000 was "struggling but surviving."  He testified that he spoke with someone regarding buying an ATV.  He was at his house on November 30, 2000, with Boone and Briskey, and they were discussing an ATV.  He was angry with Briskey because he did not bring an ATV with him, as previously agreed upon.

Petitioner testified that he awoke the next morning at around 7:30 a.m.  He said he was counting the store's proceeds from the previous week.  He did not go to a bank.  He had several thousand dollars on him, which was not unusual.  He said he never finished counting the money and decided to count it at the store.  He went to the store with Boone.

Petitioner denied ever talking to Briskey about a would-be robbery route.  He testified that he did not rob the bank and did not know who did.

5

After a three-day trial, the jury convicted Petitioner.  He was sentenced as described.

Following his sentencing, Petitioner filed a Motion for a *Ginther*[2] Hearing and for Resentencing with the trial court.  On March 9, 2002, a hearing was held where Petitioner's trial counsel, Roderick Dunham, and others were called to testify.  Following the hearing, the trial court denied Petitioner's Motion.

Petitioner then filed his direct appeal with the Michigan Court of Appeals, raising claims concerning his sentencing, the effectiveness of trial counsel, prosecutorial misconduct with respect to the handling of the ski mask, and trial court error in binding him over because the evidence presented at the preliminary-examination hearing was insufficient.  The Court of Appeals affirmed Petitioner's convictions and sentences. *Bradford*, 2003 WL 22495579, at *8.

Petitioner subsequently filed an Application for Leave to Appeal the Court of Appeals's decision with the Michigan Supreme Court, raising the same claims raised in the Court of Appeals, except for the sentencing claim.  The Application was denied on April 30, 2004.  *People v. Bradford*, 470 Mich. 860, 679 N.W.2d 73 (2004) (Table).

Petitioner did not filed a Petition for Writ of Certiorari with the United States Supreme Court.  Rather, on July 22, 2005, he filed this Habeas Petition, raising claims concerning prosecutorial misconduct, the effectiveness of trial counsel, and trial court error.  The Petition was signed and dated July 15, 2005.

---

[2]*People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973).

On May 22, 2007, Petitioner retained counsel and counsel filed a Motion to Stay the proceedings.  On July 7, 2007, the Court granted Petitioner's request to stay his habeas proceedings in order for him to return to state court to exhaust his state-court remedies with respect to his claim regarding the failure of the prosecutor to DNA test the ski mask, which was linked to the crime.

Petitioner returned to the trial court and filed a Motion for Relief from Judgment, in which he argued he should be permitted to conduct independent DNA testing of a portion of the knitted mask alleged to have been worn by the actual bank robber and taken by the Michigan State Police for DNA testing.  He also requested that all documents generated by the State Police in the course of its forensic testing be provided.  The trial court denied the Motion on October 1, 2007.  *People v. Bradford*, No. 2001-259131-FH (Hillsdale Cnty. Cir. Ct. Oct. 1, 2007).  The Court of Appeals and the Michigan Supreme Court denied his Applications for Leave to Appeal "because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Bradford*, No. 288004 (Mich.Ct.App. Oct. 24, 2008); *People v. Bradford*, 484 Mich. 865, 769 N.W.2d 664 (2009) (Table).

Subsequently, on September 7, 2009, Petitioner returned to this Court and filed a Motion to Lift the Stay, along with an Amended Habeas Petition, which the Court granted on September 14, 2009.  In his Amended Habeas Petition, Petitioner raises claims concerning a *Brady* violation, prosecutorial misconduct, and the effectiveness of trial and appellate counsel.

## III.    STANDARD OF REVIEW

7

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that

8

state-court decisions be given the benefit of the doubt.'"  *Renico v. Lett*, --- U.S. ---, ---, 130 S.Ct. 1855, 1862 (2010) ((quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam )).  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, --- U.S. ---, ---, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Id.*  "[I]f this standard is difficult to meet, that is because it was meant to be."  *Harrington*, --- U.S. ---, 131 S.Ct. at 786.  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents.  *Id.*  "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)) (Stevens, J., concurring in judgment)).

9

Indeed, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford*, 537 U.S. at 24. Thus, in order to obtain habeas relief in federal court, a prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, --- U.S. ---, 131 S.Ct. at 786-87.

## IV.   DISCUSSION

### A.   Procedural Default

As an initial matter, Respondent argues that Petitioner's claims are barred by procedural default because his claims were not raised in Petitioner's direct appeal. Rather, they were first presented to the state trial court in his Motion for Relief from Judgment. As a result, Respondent argues that review of the claims are procedurally barred. Respondent is correct.

However, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, to the extent that any of Petitioner's claims are procedurally defaulted, the Court finds that the interests of judicial economy are best served by addressing the merits of the procedurally-defaulted claims.

**B.     Petitioner's Claims**

**1.     *Brady* violation**

In his first habeas claim, Petitioner alleges that the prosecutor committed misconduct with respect to the handling of the ski mask; that a *Brady* violation occurred. Additionally, Petitioner argues that he is entitled to independent DNA testing of the mask in order to demonstrate that he was not the perpetrator of the crime.

First, to the extent that Petitioner is claiming that the prosecutor violated state discovery rules, he would not be entitled to habeas relief. "It is well settled that there is no general constitutional right to discovery in a criminal case." *Stadler v. Curtin*, 682 F.Supp.2d 807, 818 (E.D. Mich. 2010) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988)). A claim that a prosecutor violated state discovery rules is not cognizable in federal habeas review, because it is not a constitutional violation. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002). A federal habeas court may only grant habeas relief to a petitioner "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a). Therefore, habeas relief may not be based upon perceived error of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Second, regarding Petitioner's *Brady* claim, the Supreme Court has held that the prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In other words, to find a *Brady* violation, not only must the evidence be suppressed, but the suppressed evidence must be material and favorable to the accused. *Elmore v. Foltz*, 768 F.2d

11

773, 777 (6th Cir. 1985).

Favorable evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432-36 (1995).  Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993).  The duty to disclose favorable evidence includes the duty to disclose impeachment evidence. *Bagley*, 473 at 682; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Mullins v. United States*, 22 F.3d 1365, 1370-71 (6th Cir. 1994) (same).  Moreover, a *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure.  *See United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986).  Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of the petitioner's guilt.  *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (same).  The petitioner bears the burden of establishing a *Brady* violation. *Carter*, 218 F.3d at 601.

At trial, there was testimony that the ski mask was sent to the Michigan State

12

Crime Laboratory for analysis but it was contaminated with extraneous material (dog

hair). The sergeant testified that no human hair was discovered within the mask.

However, after Petitioner was convicted but before he was sentenced, the Michigan

State Police issued a report stating:

> The area inside the black knit cap around the nose and mouth areas appeared to have cellular material present and was removed for possible future analysis.
>
> The section of the knit hat removed from the mouth and nose area were turned over to the Biology Subunit for DNA analysis on 6/5/01.

Another memorandum directed to the prosecutor stated:

> F/S Bard-Curtis did not complete this analysis in time for trial. The East Lansing Laboratory was due to move to our new facility in Lansing in late December. Much of the laboratory equipment needed for analysis was packed away for the move. An ice storm shortly before the move delayed the moved until April/May 2001. Many cases could not be completed during the period 12/00-5/01, due to the laboratory move.
>
> The evidence was returned on 5/14/01 with no report issued. A report was issued by F/S/ bard-Curtis on 5/31/02. F/S/ Bard-Curtis turned over a section of the mask around the nose and mouth to the biology subunit for DNA testing on 6/5/01.

In this case, prior to trial, Petitioner moved to dismiss the case based on the

prosecutor not reporting the DNA test results to him until the Friday before trial. The

Court of Appeals, in a reference to a challenge of the prosecution's handling of the ski

mask, stated:

> Defendant's prosecutorial misconduct argument centers on defendant's motion to dismiss the case based on the DNA results obtained from the ski mask. Defendant contended that the prosecution did not report the test results to defendant until the Friday before trial. The trial court inquired of defendant whether he requested that certain tests be performed, to which defendant responded that he wanted the results from all tests performed.

13

Following defendant's motion, Detective William Kanouse informed the trial court that the ski mask was sent to the trace evidence unit for testing, at which time dog hair was found in the ski mask. Kanouse explained that no human hair was discovered in the ski mask, and that no DNA testing was requested on the mask because there was nothing found in the ski mask that could be tested. The trial court denied defendant's motion to dismiss, indicating that although there was a delay in getting the report to defendant by the Michigan State Police, there were no results to report.

We find that defendant has failed to demonstrate that the prosecutor committed misconduct with regard to the ski mask test results. There is no indication from the transcripts or from defendant's brief on appeal that the delay in the DNA examination or the DNA report was caused by the prosecution. In fact, defendant fails to connect his argument regarding his motion to dismiss with any specific prosecutorial act whatsoever. "'Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position.'" Accordingly, defendant has failed to substantiate his claim of prosecutorial misconduct.

*Bradford*, 2003 WL 22495579, at *4-5 (citation omitted).

The Court of Appeals further stated:

We find that defendant has failed to demonstrate that the prosecution committed a *Brady* violation in this case. First, there was no indication that the prosecution possessed evidence favorable to defendant. As previously stated, the analysis of the ski mask revealed that no results were obtained from the ski mask. Even if viewed as favorable evidence, defendant has failed to demonstrate that the prosecution suppressed any evidence, and fails to identify any evidence that was allegedly suppressed at trial. At trial, Kanouse informed the court that the mask had been sent for analysis, but that no analysis or results had been obtained, and that the only evidence found on the ski mask was dog hair. Based on defendant's failure to identify the suppression of any evidence, defendant has failed to demonstrate that a reasonable probability exists that the outcome of the proceedings would have been different if the alleged "evidence" had been disclosed to defendant. Defendant's argument merely reflects that disclosure of the absence of test results was allegedly untimely, and does not indicate that there was a suppression of any evidence. Thus, defendant's argument that the prosecution committed a *Brady* violation fails.

*Bradford*, 2003 WL 22495579, at *6.

14

Petitioner was able to contest the prosecution's evidence at trial and testify that he did not commit the charged offenses. The jury apparently did not believe Petitioner. Petitioner's claim that further DNA testing would have uncovered exculpatory evidence is entirely speculative and conclusory. Petitioner bears the burden to establish entitlement to habeas relief. He has not offered exculpatory evidence in support of his assertions. Moreover, the Court notes that a prosecutor has no obligation to investigate or discover exculpatory evidence or conduct additional scientific testing that might lead to exculpatory evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 59 (1988).

The Court finds that the Court of Appeals correctly noted that "there is no indication from the transcripts or from defendant's brief on appeal that the delay in the DNA examination or the DNA report was caused by the prosecution" and that Petitioner failed "to connect his argument regarding his motion to dismiss with any specific prosecutorial act whatsoever." *Bradford*, 2003 WL 22495579, at *5.

Therefore, for the reasons noted by the Court of Appeals, Petitioner's *Brady* claim is without merit. The record supports the Court of Appeals's decision with respect to this claim. That decision is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Habeas relief is not warranted.

Finally, Petitioner argues that he is entitled to DNA testing of the mask in order to establish that he was not the perpetrator of the crime. The Supreme Court of the United States has never held that the Constitution guarantees a right of post-trial discovery to a state criminal defendant. Indeed, to the extent that the Supreme Court has opined in this area, its decisions point in the opposite direction. *See District Attorney's Office v. Osborne*, 557 U.S. 52, ---, 129 S.Ct. 2308, 2326 (no due process right to post-conviction

15

DNA testing).  To the extent Petitioner argues that DNA testing would reveal exculpatory evidence: "Any convicted person, no matter how compelling the evidence against him or her, could argue that DNA testing is necessary to rule out the unsubstantiated possibility that someone else committed the crime."  *Karr v. Lafler*, No. 10-CV-14957, 2011 WL 5405818, at *3 (E.D. Mich. Nov. 8, 2011) (citing *Bible v. Schriro*, 651 F.3d 1060, 1065-66 (9th Cir. 2011); *accord Campbell v. Warden of Lieber Corr. Inst.*, No. 0:10-671-JFAPJG, 2010 WL 4668324, *5 (D.S.C. Aug. 23, 2010) (holding that speculative claims that DNA evidence will reveal actual innocence too speculative and without more are insufficient to demonstrate actual innocence).

Furthermore, prior to trial, Petitioner filed a Motion to Dismiss with the trial court based on the prosecutor not reporting the DNA test results to Petitioner until the Friday before trial, which was denied.  However, following the Motion, the trial court asked Petitioner's counsel if he wanted to exclude the ski mask from evidence.  The trial judge told Petitioner to discuss it with his attorney because it was a matter of trial strategy. Petitioner responded that he would bring the issue back before the court later that day. Later, Petitioner and defense counsel stated that they decided not to exclude the mask from evidence.


At the *Ginther* hearing, Petitioner's counsel indicated that he and Petitioner had a disagreement regarding the ski-mask evidence.  Petitioner thought the mask should be suppressed and defense counsel believed it should come in as evidence because it was damaging to the prosecution's case since there was no human DNA to link the mask to Petitioner.  Counsel believed the delay in the results was favorable to Petitioner.  He

16

explained that if there were no DNA results, then he would be able to blame the prosecution and the police for that, that if the results were favorable, then it would come in as proper exculpatory evidence, or that if the results were unfavorable to defendant, then he would argue to suppress the results based on unfair surprise.

The Court finds that Petitioner cannot satisfy his burden.  From the record, there is no indication that the prosecution intentionally or otherwise suppressed the DNA evidence.  Furthermore, testimony from the detective indicated that he informed the trial court that the ski mask was sent to the trace evidence unit for testing, at which time dog hair was found in the ski mask.  He explained that no human hair was discovered in the ski mask, and that no DNA testing was requested on the mask because there was nothing found in the ski mask that could be tested.[3]  The trial court then found that, although there was a delay in getting the report to defendant by the Michigan State Police, there were no results to report.

With that, the Court concludes that Petitioner is not entitled to habeas relief with respect to his first habeas claim.

### 2.   Prosecutorial Misconduct

In his second habeas claim, Petitioner alleges that the prosecutor committed misconduct when he defined his case in biblical terms in closing argument:

---

[3]The Court notes that a letter sent by Detective Kanouse to the prosecutor, dated October 29, 2007, indicates, "In response to your request of October 25, 2007 to preserve all evidence associated with the above[-]captioned matter bearing complaint [], please be advised that the complaint was closed on August 27, 2002 and the last piece of property was disposed of on August 26, 2002."  Letter attached to Petitioner's Brief to the Michigan Supreme Court regarding the trial court's denial of his Motion for Relief from Judgment.

What he has in his favor is his mouth, his testimony, the testimony that he has been thinking about for a long time. There isn't any physical evidence. Anything other than his conjectures and the diversions that he wants you to follow. There is one thing that he can't controvert. Truth. That's a goat. In the old days of the Old Testament the Hebrews once a year on the Day of Atonement would, during a ritualistic ceremony, place their wrongs and their sins upon a goat, which they would then let go. That was their way of releasing their wrongs and their sins, that one day a year, on the Day of Atonement.

Mr. Bradford wants someone else to be his scapegoat. Today is the date of Atonement, ladies and gentlemen. Mr. Bradford is ducking and weaving and he wants to look past the truth through a small hole that he has tried to create in the wall of truth. * * * And today, his day of atonement * * * This – this is his day of atonement * * * Don't let this goat get away. Remember the truth and convict the defendant of armed robbery and the other two counts.

Trial Tr. vol. III, 836-38 May 17, 2001.

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a prosecutorial misconduct claim, a habeas petitioner must demonstrate that the prosecutor's remarks or conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id.* at 452. Upon a finding of impropriety, the court must decide whether the statements were flagrant. *Id.* Flagrancy is determined by an examination of four

18

factors: (1) whether the statements tended to mislead the jury or prejudice the accused; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused. *Id* .; *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citations omitted).

Petitioner claims that the foregoing comments by the prosecutor were improper religious references which may have prejudiced the jury. It is well-settled that a prosecutor may not make remarks "calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). A prosecutor improperly invokes the passions and prejudices of the jury when he or she "calls on the jury's emotions and fears–rather than the evidence–to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008). Additionally, "[c]ourts universally condemn" the injection of religion into legal proceedings. *See Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir. 2004).

In this case, the Court finds that the prosecutor's remarks, however, were not an attempt to improperly appeal to the jurors' religious beliefs. The reference was in regard to Petitioner wanting someone else to be his scapegoat. The prosecutor was telling a story, though the Court believes that he should not have told a biblical story. Nevertheless, it was a story. The prosecutor did not argue that the jury should consider

19

religious beliefs or base its decision upon religion or any other impermissible factor.

Even if the prosecutor's references were improper, they were not so flagrant as to deprive Petitioner of a fair trial. *See United States v. Roach*, 502 F.3d 425, 436 (6th Cir. 2007) (finding that the prosecutor's reference to the Ten Commandments during closing arguments did not warrant reversal on direct appeal); *Williams v. McKee*, No. 04-73326, 2007 WL 2324953, *6 (E.D. Mich. Aug. 14, 2007) (denying habeas relief on prosecutorial misconduct claim involving biblical passage on flight); *Hobbs v. Lafler*, No. 05-CV-73907-DT, 2007 WL 1098540, *5-6 (E.D. Mich. Apr. 12, 2007) (denying habeas relief on prosecutorial misconduct claim involving prosecutor's reference to "casting lots"). The prosecutor's remarks, while deliberate, were isolated, were not misleading or prejudicial, and were not an overt appeal to religious convictions.

Moreover, there was significant evidence of Petitioner's guilt presented at trial. The prosecution presented twenty-one witnesses and over fifty pieces of documented evidence. Therefore, habeas relief is not warranted on this claim.

### 3.    Ineffective Assistance of Trial Counsel

In his third habeas claim, Petitioner asserts that his trial counsel was ineffective for his strategy as to the black knitted mask; it was counsel's position that there was no DNA evidence associated with the mask. Petitioner also claims that defense counsel was ineffective for failing to object to the biblical metaphors.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that

counsel's performance was deficient.  That requires a showing that counsel made errors

so serious that he or she was not functioning as counsel as guaranteed by the Sixth

Amendment.  *Strickland*, 466 U.S. at 687.  Second, the petitioner must establish that

counsel's deficient performance prejudiced the defense.  Counsel's errors must have

been so serious that they deprived the petitioner of a fair trial or appeal.  *Id.*

With respect to the performance prong, a petitioner must identify acts that were

"outside the wide range of professionally competent assistance" in order to prove

deficient performance.  *Id.* at 690.  The reviewing court's scrutiny of counsel's

performance is highly deferential.  *Id.* at 689.  Counsel is strongly presumed to have

rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment.  *Id.* at 690.  The petitioner bears the burden of

overcoming the presumption that the challenged actions were sound trial strategy.  *Id.*

at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A

reasonable probability is one that is sufficient to undermine confidence in the outcome.

*Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be

whether counsel's conduct so undermined the proper functioning of the adversarial

process that the [proceeding] cannot be relied on as having produced a just result."  *Id.*

at 686.

In *Harrington*, the Supreme Court confirmed that a federal court's consideration

21

of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance.  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington*, 131 S.Ct. at 788 (internal and end citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.  *Id.* at 788.

With regard to the defense strategy of no DNA evidence, as discussed, *see* section IV, B, 1, *supra*, at the *Ginther* hearing, counsel testified that he and Petitioner had a disagreement regarding the ski-mask evidence.  It was Petitioner's position that the ski mask should be suppressed, and counsel thought the mask should come in as evidence because it was damaging to the prosecution's case, since no human DNA linked the mask to Petitioner.  Defense counsel also believed that the delay in the results was favorable to Petitioner no matter what happened.  He explained that if there were no DNA results, he would be able to blame the prosecution and the police for that, that if the results were favorable to Petitioner, such would come in as proper exculpatory evidence, or that if the results were unfavorable to Petitioner, then he would argue to suppress the results based on unfair surprise.

As noted, decisions as to what evidence to present and whether to call certain witnesses are presumed to be a matter of trial strategy, and the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense.  *See Chegwidden v. Kapture*, 92 F.App'x 309, 311

22

(6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6 Cir. 2002).  The fact that trial

counsel's strategy was ultimately unsuccessful does not mean that he was ineffective.

*See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an

ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a

defendant's trial counsel were reasonable, even if mistaken").

Petitioner also asserts that defense counsel was ineffective for failing to object to

the aforementioned alleged instances of prosecutorial misconduct; defense counsel's

failure to object to the prosecutor's use of a biblical metaphor in closing argument.

Given the Court's determination that Petitioner's prosecutorial-misconduct claim lacks

merit, however, Petitioner cannot establish that defense counsel was ineffective for

failing to object to such matters.  *See* section IV, 2, *supra*.  Habeas relief is not

warranted on Petitioner's ineffective-assistance-of-counsel claims.

### 4.      Ineffective Assistance of Appellate Counsel

Petitioner asserts that he is entitled to habeas relief because appellate counsel

was ineffective for failing to raise the foregoing defaulted issues on direct appeal in the

state courts.  Petitioner, however, is not entitled to habeas relief on any independent

claims challenging appellate counsel's conduct.  As explained *supra*, the defaulted

claims lack merit and Petitioner has not shown that appellate counsel was ineffective

under the *Strickland* standard.  Habeas relief is therefore not warranted on this claim.

### C.      Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no

automatic right to appeal a district court's denial or dismissal of the petition.  Instead,

[the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  [].  When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that reasonable jurists would not find its resolution of Petitioner's claims debatable.  The Court therefore declines to issue Petitioner a Certificate of Appealability.

## V.   CONCLUSION

Petitioner has failed to establish that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, **IT IS ORDERED** that Petitioner's Petition for Writ of Habeas Corpus [dkt. # 1] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a Certificate of Appealability.

24

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: February 10, 2012


CERTIFICATE OF SERVICE

 I hereby certify that on the above date a copy of this Opinion and Order was

served upon the Petitioner, via ordinary U.S. Mail, and Counsel for the

Respondent, electronically.

s/Bernadette M. Thebolt

Case Manager

25